IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

<table>
<tr><td>TORUS VENTURES LLC,<br><br>Plaintiff,<br><br>v.<br><br>BRINKER INTERNATIONAL, INC.,<br><br>Defendant.</td><td>Civil Action No: 2:25-cv-00102-JRG<br><br>PATENT CASE<br><br>JURY TRIAL DEMANDED<br><br>LEAD CASE</td></tr>
<tr><td>TORUS VENTURES LLC,<br><br>Plaintiff,<br><br>v.<br><br>TEXAS MUTUAL INSURANCE COMPANY,<br><br>Defendant.</td><td>Civil Action No: 2:25-cv-00184-JRG<br><br>PATENT CASE<br><br>JURY TRIAL DEMANDED<br><br>MEMBER CASE</td></tr>
</table>

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT TEXAS MUTUAL INSURANCE COMPANY'S RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff Torus Ventures, LLC ("Torus" or "Plaintiff") submits this brief in opposition to the Defendant Texas Mutual Insurance Company ("Texas Mutual" or "Defendant") Rule 12(b)(6) Motion to Dismiss (the "Motion") filed on April 14, 2025 (Dkt. No. 67). For the reasons set forth below, the Motion should be denied.

## I. INTRODUCTION

Defendant's Motion to Dismiss is without merit, and errs both procedurally and substantively. In its Motion, Defendants offer varying characterizations of the '844 Patent, referring at times to "multilevel encryption" and, at others, to "encrypting data that has already

been encrypted," all while impermissibly oversimplifying the claims and ignoring Plaintiff's alleged inventive concepts. Contrary to Defendant's formulations, however, the '844 Patent is not directed to merely encrypting already-encrypted data or providing multiple layers of encryption, though Defendant has provided no authority that even these characterizations are necessarily "abstract." Rather, the '844 Patent provides a specific recursive security protocol that fundamentally alters conventional security architecture by encrypting both protected content and the means to access that content (i.e., the means of decryption). This recursive approach creates nested, self-contained security structures that address specific technological problems in digital rights management, problems the '844 Patent explicitly identifies and solves.

Defendant improperly invites the Court to determine at the pleading stage that the claimed recursive security protocol was somehow "conventional," despite explicit allegations to the contrary in Torus's pleadings and descriptions in the '844 Patent itself. This is exactly what this Court has warned against doing at the pleading stage, as it would require improper judicial notice of disputed factual issues. Defendant's Motion raises numerous factual questions regarding what was "well-understood, routine, and conventional" at the time of invention - questions that cannot properly be resolved on a Rule 12 motion.

At bottom, the architectural advancement claimed in the '844 Patent represents a non-abstract, technological improvement that enhances computer security while improving efficiency. This is not an abstract idea but a concrete technological solution to specific technological problems.

Accordingly, as argued herein, this Court should deny Defendant's premature and meritless Motion in its entirety. In the alternative, the Court should grant leave to amend.

## II. TECHNICAL BACKGROUND OF THE '844 PATENT

"Prior to the invention of the '844 Patent, conventional systems and methods for protecting digital copyrighted content were ineffective against sophisticated unauthorized access.

These conventional systems typically relied on simple access control mechanisms that could be easily bypassed, rendering protection inadequate once breached." Dkt. No. 62 at ¶ 10.

"The conventional digital rights management solutions of the prior art had several technological deficiencies." Dkt. No. 62 at ¶ 11. The conventional solutions of the prior art attempted to make "distinctions between the various types of bit streams to be protected" rather than treating all digital data uniformly. *Id*. (quoting '844 Patent, 2:30-32). Conventional solutions were "independent of the actual mechanism for encrypting or decrypting the actual data." *Id*. (quoting '844 Patent, 2:7-8).

Prior art content protection methods also depended on "controlling the ability to access a particular data set" rather than "controlling the act of expressing the ideas contained within that data set." Dkt. No. 62 at ¶ 12 (quoting '844 Patent, 28:59-64). "This technical approach was fundamentally flawed because once access control was bypassed, the protection was entirely lost." *Id*.

The '844 Patent addressed these technological deficiencies by providing "systems and methods for security protocols, which may utilize a variety of encryption techniques to better protect digital content." Dkt. No. 62 at ¶ 13 (quoting '844 Patent, 2:54-56). The invention recognized that "on a fundamental level, all binary digital data can be reduced to a stream of 1's and 0's (a bitstream), which can be stored and retrieved in a manner which is completely independent of the intended purpose or interpretation of that bitstream." *Id*. (quoting '844 Patent, 2:31-36).

"To address these technological deficiencies and to provide for enhanced security, the '844 Patent claims unconventional and inventive systems and methods for implementing recursive security protocols that provide multiple, nested layers of content protection." Dkt. No. 62 at ¶ 14. The claimed invention provides a recursive security approach that maintains protection by encrypting a bitstream with a first encryption algorithm, associating a first decryption algorithm with the encrypted bit stream, and then encrypting both the encrypted bit

stream and the first decryption algorithm with a second encryption algorithm to yield a second bit stream, which is then associated with a second decryption algorithm. *Id.* (citing ’844 Patent, claim 1).

“The systems and methods claimed in the ’844 Patent represent an architectural advancement in computer security technology by providing a protection mechanism that maintains security integrity even when portions of the system are compromised.” Dkt. No. 62 at ¶ 15. “Thus, the claimed invention implements a recursive approach to digital rights management that was not previously available in conventional systems.” *Id*. (citing ’844 Patent, 4:18-21) (“Since these protocols are based on the premise that all digital bit streams are equal, it can even be used in a recursive fashion in order to control access to updates to the protocol itself.”).

“Rather than simply computerizing pre-existing processes, the ’844 Patent claims specific implementations not previously available in the prior art, wherein digital content is protected through multiple layers of encryption and verification, with each layer requiring different access protocols, thus significantly enhancing the security of digital content against unauthorized access or use.” Dkt. No. 62 at ¶ 16.

“The recursive security systems and methods claimed in the ’844 Patent improved computer functionality by integrating layered security protocols that adapted to attempted breaches in a manner that prior art solutions could not, providing a highly versatile and robust content protection system.” Dkt. No. 62 at ¶ 17. This unconventional and inventive approach permits secure updates to the system itself, as “the security of the whole list is always based on the latest iteration of the security software.” *Id*. (quoting ’844 Patent, 18:47-50).

As the ’844 Patent explains, the invention provides a “recursive security protocol,” and “[t]his capability means that the security protocol can be updated (to fix recently discovered security holes, for example) without requiring any changes to the hardware on which it is running, even during execution. Dkt. No. 62 at ¶ 18. “The ‘older’ security system is ‘subsumed’ as a part of the newer security system (i.e., you never have to strip the old protection ‘wrapper’

away in order to add a new, potentially more secure, level of protection to the entire system). Thus, the entire system is encapsulated in the latest, most secure encryption and/or access control system. Not only may new keys be added, but entirely new security and/or encryption algorithms can be added on top of existing systems as well." *Id.* (quoting '844 Patent 4:32-43). "Thus, the unconventional and inventive 'recursive security protocol' of the '844 Patent not only provided a more secure solution than did conventional systems and methods, but improved the efficiency of the computer, sparing system resources from being expended in stripping away 'older' security systems and updating them more efficiently." *Id*.

"Thus, the claims of the '844 Patent describe a specific improvement to the way computers operate and implement digital rights management by employing a recursive security model where 'the digital nature of these data is all that is important to the protocol.'" Dkt. No. 62 at ¶ 19 (quoting '844 Patent, 4:27-29). Unlike conventional approaches that distinguished between different types of data, the claimed invention treats all digital data uniformly, enabling a more robust security framework. *Id.*

The inventive and unconventional recursive security protocol claimed in the '844 Patent was also more "flexib[le]" than conventional solutions in that it could "support a number of business models, including Time-limited Rental, Pay-per-view, Multiple Versioning, Machine-dependent License Revocation and Permanent Transfer of Ownership from one user to another." Dkt. No. 62 at ¶ 20 (quoting '844 Patent, 4:44-48).

These inventive concepts, including the inventive and unconventional "recursive" security protocol, are captured in the limitations of Claim 1 reciting the steps of "encrypting both the encrypted bit stream and the first decryption algorithm with a second encryption algorithm to yield a second bit stream" and "associating a second decryption algorithm with the second bit stream." Dkt. No. 62 at ¶ 21. These steps require the inventive and unconventional "recursive" security protocol. *Id*.

None of the methods or systems of the ’844 Patent were previously performed by human beings, or capable of being performed in the human mind. Dkt. No. 62 at ¶ 22.

## III. ARGUMENT

### A. Defendant’s Section 101 Arguments Are Premature and Raise Disputed Issues of Fact That Preclude Resolution of Section 101 Issues at the Pleading Stage

The analysis of patent-eligibility under 35 U.S.C. § 101 involves “question[s] of fact,” such as “whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field.” *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Thus, “plausible and specific factual allegations that aspects of the claims are inventive are sufficient” to “defeat[] a motion to dismiss.” *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019) (stating that “factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101,” and noting that “[w]e have no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law”); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–27 (Fed. Cir. 2018) (finding factual allegations of patentee’s complaint were sufficient to survive a motion to dismiss and stating that “patentees who adequately allege its claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)”). Therefore, where a disputed issue of fact relevant to the analysis of patent-eligibility under Section 101 exists, eligibility may not be resolved at the pleading stage.

Many courts have found that “the issue” of eligibility under Section 101 “is inherently ill suited to adjudication at the pleading stage, particularly when the dispute turns on whether the claims are impermissibly abstract,” as here. *Ubiquitous Connectivity, LP v. Cent. Sec. Grp. - Nationwide, Inc.*, No. 18-CV-368-JED-CDL, 2021 WL 1970664, at *3–4 (N.D. Okla. May 17, 2021). “‘Determining patent eligibility requires a full understanding of the basic character of the claimed subject matter’…but the two tools mostly likely to aid the court in developing such an

understanding—claim construction and the presentation of expert testimony—will not ordinarily have occurred at the dismissal stage." *Id.* (quoting *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019)). Further, the "*Alice* test is notoriously difficult to apply, even in the best of circumstances. In a recent survey of judges who frequently handle patent cases, respondents rated eligibility under § 101 to be the most difficult issue of patent validity and the area of patent law with the least doctrinal clarity." *Id*. (citing Matthew G. Sipe, *Patent Law 101: The View From the Bench*, 88 Geo. Wash. L. Rev. Arguendo 21, 29 (2020)). "When this task is undertaken at the pleading stage, where a court cannot benefit from the claim construction process and a developed factual record, accuracy will be the exception rather than the rule." *Id*.

Indeed, as this Court itself has warned, "[r]esolving validity issues at the Rule 12 stage can also tempt courts, sometimes improperly, to conclude that certain concepts are conventional or routine by way of judicial notice." *Intellectual Ventures II LLC v. FedEx Corp.*, 2017 WL 6002762, at *2 n. 1 (E.D. Tex. 2017) (Gilstrap. J.).

For these reasons, many courts have found "it is wiser and more efficient to wait to determine a patent's § 101 eligibility until after fact discovery has opened" and "after issuing its claim construction order." *Slyce Acquisition Inc. v. Syte - Visual Conception Ltd.*, No. W-19-CV-257, 2020 WL 278481, *3–7 (W.D. Tex. Jan. 10, 2020) (noting, *inter alia*, that "a Rule 12(b) motion to dismiss is a procedurally awkward place for a court resolve a patent's § 101 eligibility"); *see also e-Numerate Sols., Inc. v. United States,* 149 Fed. Cl. 563, 577–79 (2020) (accord).

As argued further herein, Defendant's Motion is premature in that it raises factual issues that would benefit from a more developed record, and should be denied on that basis alone. In particular, Defendant raises a factual dispute regarding whether "multilevel encryption," "encrypting data that has already been encrypted," and encrypting the means of decryption were somehow "well-understood, routine and conventional" at the time of invention.

**B. The '844 Patent is Directed to Patent-Eligible Subject Matter**

Defendant presents multiple formulations of its purported “abstract idea,” arguing variously that that the claims of the ’844 Patent are directed to “the abstract idea of encrypting data that has already been encrypted,” and later that the claims are directed to “the abstract idea of multilevel encryption.” Dkt. No. 67 at 8, 10. Both characterizations, however, impermissibly oversimplify the ’844 Patent’s claims. Because “all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas,” *Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 71 (2012), “courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims[,]” *McRO Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (“[D]escribing the claims at [too] high [a] level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.”).

The claims of the ’844 Patent are not, as Defendant suggests, directed merely to the abstract idea of “multilevel encryption” or “encrypting data that has already been encrypted.” Rather, they are directed to a specific implementation of a recursive security protocol that provides multiple, nested layers of content protection in an inventive and unconventional way. This distinction is critical because, as the Federal Circuit has recognized, claims directed to a “specific implementation” of an idea, rather than the idea itself, are patent-eligible. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020) (finding claims that went “beyond managing access to objects using multiple levels of encryption” to be patent-eligible).

Notably, *TecSec* itself did not stand for the proposition that either “encrypting data that has already been encrypted” or “multilevel security” were somehow necessarily abstract. *TecSec*, 978 F.3d at 1295. Defendant has no authority for either proposition. Thus, Defendant’s arguments fail even if its characterization of Claim 1 were appropriate (which it is not).

Regardless, Defendant’s reliance on *TecSec* actually undermines rather than supports its Section 101 challenge. The Federal Circuit in *TecSec* found patent-eligible claims that involved

multilevel encryption because they went "beyond managing access to objects using multiple levels of encryption." *Id*. Like the claim in *TecSec*, Claim 1 of the '844 Patent goes beyond merely applying multilevel encryption. The *TecSec* claim was found to be patent-eligible because it incorporated specific elements—notably the "object-oriented key manager" and the use of "labels"—that made it a specific implementation rather than an abstract idea. Similarly, Claim 1 of the '844 Patent includes specific elements that distinguish it from a generic multilevel encryption scheme.

Most critically, Claim 1 recites a "recursive security protocol" that specifically requires "encrypting both the encrypted bit stream and the first decryption algorithm with a second encryption algorithm." This is not merely applying a second layer of encryption to already-encrypted data—it is encrypting the means of decryption itself along with the data, creating an inventive and fundamentally different security architecture as compared to conventional multilevel encryption. Dkt. No. 62 at ¶ 15 (alleging inventive "architectural" improvements over the conventional systems and methods of the prior art).

In *TecSec*, the Federal Circuit emphasized that the claims were "directed to improving a basic function of a computer data-distribution network, namely, network security." 978 F.3d at 1296. Similarly, the '844 Patent is directed to improving the fundamental computer function of digital content protection through its recursive security protocol.

The critical distinction between simple multilevel encryption and the recursive security protocol of the '844 Patent is that the latter creates a nested, self-contained security structure where each layer encapsulates both the protected content and the means to access that content. This architecture directly addresses the technological problem identified in the '844 Patent: the inability of prior art systems to uniformly protect different types of digital content and to update security protocols without removing existing protections. Dkt. No. 62 at ¶¶ 10-13. Just as the *TecSec* claims went beyond simple multilevel security through its use of an object-oriented key

manager and labels, Claim 1 goes beyond multilevel encryption through its recursive structure that encapsulates both content and decryption means within subsequent encryption layers.

This recursive approach represents a specific implementation of a security protocol, not the abstract idea of encryption generally. The Federal Circuit recognized in *TecSec* that although the claims involved “multilevel security,” this did “not negate the conclusion that the patent is aimed at solving a particular problem” in computer technology. 978 F.3d at 1296. Similarly, although Claim 1 of the ’844 Patent involves encrypting already-encrypted data, this does not negate the conclusion that the patent is aimed at solving the specific technological problem of creating a uniform, updatable security system for all types of digital content.

The present case is analogous to *Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2016 WL 626495 (D. Del. Feb. 16, 2016), where the court found that “the heart of the invention is more particular than simply ‘keeping track of communications’ amongst computers—it is the specific concept of recursively embedding state in continuations, in order to keep track of that content.” *Id.* at *10. There, the court recognized that the “‘recursively embedding’ concept is clearly not an ‘inherent’ step for keeping track of state, as confirmed by the patent’s detailed descriptions of the various prior art methods used to accomplish this task.” *Id*. at *8.

Just as the *IBM* patent claimed a specific implementation of recursively embedding state information, here the ’844 Patent claims a specific implementation of a recursive security protocol for protecting digital content. Here, as in *IBM*, the “recursive security protocol” is not “inherent” in the prior art, as confirmed by the fact that prior art systems and methods for securing digital data lacked this feature. Dkt. No. 62 at ¶¶ 10-13. Defendant has no basis for asserting otherwise, and the Court should decline its invitation to “[r]esolv[e] validity issues at the Rule 12 stage,” which “can also tempt courts, sometimes improperly, to conclude that certain concepts are conventional or routine by way of judicial notice.” *Intellectual Ventures II LLC v. FedEx Corp.*, 2017 WL 6002762, at *2 n. 1 (E.D. Tex. 2017) (Gilstrap, J.).

Defendant's remaining authorities—*Universal Secure Registry LLC v. Apple Inc*., 10 F.4th 1342, 1351-53 (Fed. Cir. 2021), *Dropbox, Inc. v. Synchronoss Techs., Inc*., 815 F. App'x 529, 531-534 (Fed. Cir. 2020), *Bridge & Post, Inc. v. Verizon Commc'ns, Inc*., 778 F. App'x 882, 889 (Fed. Cir. 2019)—are all inapposite as none involved encrypting the means of decryption itself, to say nothing of inventive improvements to security architecture as compared to the prior art. *See* Dkt. No. 62 at ¶ 15 (alleging inventive "architectural" improvements over the conventional systems and methods of the prior art).

Defendants argue that Claim 1 does not identify any improvement to computer functionality. Dkt. No. 67 at 11. Yet Plaintiff specifically alleges that the invention both improved "security" and "improved the efficiency of the computer, sparing system resources from being expended in stripping away 'older' security systems and updating them more efficiently." Dkt. No. 62 at ¶ 18; *id.* at ¶¶ 15-17.

Defendant further argues that Claim 1 somehow does not provide sufficient detail as to "how" the claimed method is carried out. Dkt. No. 67 at 11-12. But the *IBM* court, in considering the "question of how much 'how' must exist in a patent's claim, in order to elevate the claim from the realm of abstraction to that of patent eligibility," held that "claim 1 clearly discloses, at minimum, one level of 'how,' in reciting a specific solution to the patent's identified problem." *Int'l Bus. Machines Corp. v. The Priceline Grp. Inc*., No. CV 15-137-LPS-CJB, 2016 WL 626495, at *12-13 (D. Del. Feb. 16, 2016). Here, Claim 1 provides specific steps for exactly how the "recursive" security protocol is to be carried out. As made clear in *IBM*, where Claim 1 already provides a specific solution, Claim 1 is not required to further disclose "a set of rules dictating how exactly the server must accomplish the "recursively embedding" step" (here, the recursive security protocol)." *Id*. Regardless, Claim 1 goes beyond *IBM* in that regard, providing the specific steps for this recursive security protocol.

In sum, the '844 Patent is directed to the specific concept of a recursive security protocol that maintains protection through multiple, nested layers of encryption, including encrypting the

means of decryption, not to the abstract idea of encryption generally or even to multilevel encryption broadly. By oversimplifying and thus misidentifying the basic character of the '844 Patent's claims, Defendant has failed to meet its burden of demonstrating that the claims are directed to an abstract idea.

**C. The '844 Patent Claims Patent-Eligible Inventive Concepts**

Even if the Court were to find that the claims of the '844 Patent are directed to an abstract idea, the claims nonetheless contain inventive concepts that transform the nature of the claims into patent-eligible applications under *Alice* step two.

The recursive security protocol claimed in the '844 Patent provides a technological solution to specific problems in digital rights management that were not addressed by conventional security systems. As alleged and as explained in the '844 Patent, prior art systems and methods "were ineffective against sophisticated unauthorized access" and "relied on simple access control mechanisms that could be easily bypassed, rendering protection inadequate once breached." Dkt. No. 62 at ¶ 10. Further, the "conventional solutions of the prior art" suffered from several technical deficiencies, including making "distinctions between the various types of bit streams to be protected" and "controlling the ability to access a particular data set" rather than "controlling the act of expressing the ideas contained within that data set." Dkt. No. 62 at ¶¶ 11-12 (quoting '844 Patent, 28:59-64). "This technical approach was fundamentally flawed because once access control was bypassed, the protection was entirely lost." *Id*.

To address these deficiencies, the '844 Patent claims "unconventional and inventive systems and methods for implementing recursive security protocols that provide multiple, nested layers of content protection." Dkt. No. 62 at ¶ 14. The systems and methods claimed in the '844 Patent represent an "architectural advancement in computer security technology by providing a protection mechanism that maintains security integrity even when portions of the system are compromised. Thus, the claimed invention implements a recursive approach to digital rights management that was not previously available in conventional systems." *Id*. at ¶ 15. These

inventive concepts, including the inventive and unconventional "recursive" security protocol, are captured in the limitations of Claim 1 reciting the steps of "encrypting both the encrypted bit stream and the first decryption algorithm with a second encryption algorithm to yield a second bit stream" and "associating a second decryption algorithm with the second bit stream." *Id*. at ¶ 21.

The Federal Circuit has found that an unconventional "architecture" has provided an inventive concept. For example, in *Amdocs*, the Federal Circuit found an inventive concept in a "distributed architecture" that solved a "particular technological problem," i.e., "reduced data flows and the possibility of smaller databases." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc*., 841 F.3d 1288, 1301-1302 (Fed. Cir. 2016).

Here, Claim 1 recites a "recursive security protocol" that specifically requires "encrypting both the encrypted bit stream and the first decryption algorithm with a second encryption algorithm." This is not merely applying a second layer of encryption to already-encrypted data—it is encrypting the means of decryption itself along with the data, creating an inventive and fundamentally different security architecture as compared to conventional encryption, let alone "multilevel" encryption. Dkt. No. 62 at ¶ 15 (alleging inventive "architectural" improvements over the conventional systems and methods of the prior art).

Like the "distributed architecture" found patent-eligible in *Amdocs*, here Claim 1 claims method employing an inventive security "architecture" that encrypts the means of decryption itself, providing multiple, nested layers of content protection. As alleged, this inventive concept both improved "security" and "improved the efficiency of the computer, sparing system resources from being expended in stripping away 'older' security systems and updating them more efficiently." Dkt. No. 62 at ¶ 18; *id.* at ¶¶ 15-17.

Defendant argues that '844 Patent contains no inventive concept because it involves "generic hardware and software." Dkt. No. 67 at 14. However, the Federal Circuit has recognized that "an inventive concept can be found in the non-conventional and non-generic

arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. Here, as indicated, Torus alleges an inventive "architectural" advancement in the inventive concept of recursive security protocol, wherein the means of decryption is also encrypted. Dkt. No. 62 at ¶ 18. Regardless, Defendant confuse the inquiry regarding what is "conventional," which is a separate question from whether technology is merely "known." *See Berkheimer*, 881 F.3d at 1369. ("[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional."). As alleged, the architectural advancement of Claim 1 is not "conventional." Dkt. No. 62 at ¶ 15.

Defendant has "no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law," especially when the '844 Patent itself states that they were not. *Cellspin Soft, Inc. v. Fitbit, Inc*., 927 F.3d 1306, 1318 (Fed. Cir. 2019). Such a determination would involve disputed issues of fact that are inappropriate for resolution at the motion to dismiss stage. *See Berkheimer*, 881 F.3d at 1369 ("[W]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

For example, resolving the issue of subject matter eligibility would, at a minimum, require a factual record addressing whether "multilevel encryption," "encrypting data that has already been encrypted," and encrypting the means of decryption were somehow "well-understood, routine and conventional" at the time of invention. Defendant has no basis for asserting otherwise, or for contravening the allegations of Plaintiff's pleadings, and the Court should decline its invitation to "[r]esolv[e] validity issues at the Rule 12 stage," which "can also tempt courts, sometimes improperly, to conclude that certain concepts are conventional or routine by way of judicial notice." *Intellectual Ventures II LLC v. FedEx Corp.*, 2017 WL 6002762, at *2 n. 1 (E.D. Tex. 2017) (Gilstrap, J.).

Accordingly, Defendant's Section 101 arguments are premature in that they hinge on disputed issues of fact. In any event, they are wholly without merit.

**D. In the Alternative, Leave to Amend Should Be Granted.**

To the extent the Court is inclined to grant Defendant's Motion in any respect, the Court should permit leave to amend to allow Torus to add additional allegations supporting the '844 Patent's eligibility under Section 101. *See Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*, No. 2:20-CV-00382-JRG, 2021 WL 4206175, at *7 (E.D. Tex. Sept. 15, 2021) ("The Court should freely grant leave to amend, and the district court must have a "substantial reason" to deny a request to amend a pleading.") (citing Fed. R. Civ. P. 15(a)); *Aatrix*, 882 F.3d at 1126; *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002)); *Diatek Licensing LLC v. AccuWeather, Inc*., No. 21 CIV. 11144 (JPC), 2023 WL 2632178, at *12 (S.D.N.Y. Mar. 24, 2023) ("the Court will grant Plaintiff leave to file a Second Amended Complaint, in the event that Plaintiff believes it can plead facts that would make plausible the inference that the activities recited in at least one of the Asserted Claims were not well-understood, routine, or conventional… while Plaintiff has already amended the Complaint once, that amendment occurred before the Court's discussion, in this Opinion and Order, of the sort of allegations that would be required for Plaintiff to defeat a motion to dismiss").

Allowing Torus to amend in order to add additional allegations would not be futile. For example, as to eligibility, as they would support Torus's position that, at Step Two of the Section 101 analysis, the claimed method uses an inventive and unconventional recursive security protocol and "architectural" advancement that addressed technical deficiencies in the prior art. Given that these are issues of fact relating to the Section 101 analysis, and in light of this Court's own warning against "improperly" "conclud[ing] that certain concepts are conventional or routine by way of judicial notice," it would be appropriate to grant Torus leave to amend to add allegations regarding the unconventionality of Claim 1 and the inventive concepts captured therein. *Intellectual Ventures II LLC*, 2017 WL 6002762, at *2 n. 1 (E.D. Tex. 2017) (Gilstrap,

J.); *Berkheimer*, 881 F.3d at 1368; *Cellspin Soft, Inc*., 927 F.3d at 1317; *Aatrix*, 882 F.3d at 1126. Moreover, leave to amend is appropriate given that Torus has not had the benefit of any discussion from the Court regarding allegations relating to eligibility of the ’844 Patent. *See Diatek Licensing LLC v. AccuWeather, Inc*., 2023 WL 2632178, at *12.

## IV. CONCLUSION

Accordingly, Defendant’s Motion should be DENIED. In the alternative, Torus would ask that the Court grant leave to amend.

Dated: May 5, 2025

Respectfully submitted,

/s/ Isaac Rabicoff
Isaac Rabicoff
Rabicoff Law LLC
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
7736694590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Torus Ventures, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system for the Eastern District of Texas and that ECF system will send a Notice of Electronic Filing to the CM/ECF participants in this case on the 5th day of May, 2025.

/s/ Isaac Rabicoff
Isaac Rabicoff
Rabicoff Law LLC
www.RabiLaw.com
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
773.669.4590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Torus Ventures, LLC**